al., and the one individual cross-appellee, Billy Bowden. They were all defendants below. We ask the Court here to reverse the judgment entered by the District Court on several of the claims on several grounds. First, we ask this Court to reverse the judgment with respect to punitive damages that were entered against Defendant Concilium. The grounds are simple, which is there was not legally sufficient evidence of malice to support an award of punitive damages. As the Court knows, there must be clear and convincing evidence of a specific intent to harm someone in order to award punitive damages. And second, which played a particular role in this case, the evidence of ill will or malice has to be different from the evidence you put on to show the tort for which you're seeking punitive damages. In other words, here the tort was tortious interference. If your sole evidence is that someone tortiously interfered with your contract intentionally to get them to breach that contract, that will get you to the particular claim. It won't get you evidence of malice because it would eliminate the malice requirement because all you have to do is prove the tort. Here in this case, this was what I call essentially a garden variety employee who left a company and turns out in violation of his non-compete and was hired by another company. There was a fight at trial over whether the two companies even competed. But one thing they didn't fight about was that the individual, Mr. Gresham, who left, took with him no business, no clients, never contacted anyone from his old employer, and the appellee in this case could not identify a single lost customer from any of this. Nonetheless, the jury awarded... He took all the computer files he took. That constituted a different claim and punitive damages were not sought nor were they appropriate on that harmful access. The statute for punitive damages in Texas in the Civil Practice and Remedies Code says the conduct for which you are seeking the punitive damages must be made with malice. So other things he did unrelated to that claim, we would argue, don't support the punitive damages. He clearly went in there and... Even if... I'm not saying this is this case, but what if they tortiously interfered with the non-compete and non-disclosure requirements, et cetera, because they wanted to get files from the other company? Couldn't that support a malice finding on tortious interference if that's the specific intent? I'm not saying that's the facts here, but... I think it could, Your Honor. I mean, you're obviously not just limited to the evidence for tortious interference because you would never be able to prove it. But it has to be conduct related to that you're trying to get the punitive damages for for that claim, and the punitive damages weren't allowed under the harmful access claim. Now, if you look at what the apolis says, and because this is largely there just wasn't sufficient evidence. There was no e-mails that Consilium was out to try and injure Merritt Hawkins by hiring this one employee. There was no evidence they were trying to undermine them or trying to steal a big group of their employees. The evidence was this is the only person from that company they ever hired. They didn't hire anyone afterwards. That individual left about a year after working with us. If you look at the apolis brief... The deference we give to the jury and malice is an intent, a mens rea issue, which is particularly, I think, a fact issue that's often going to be proved by circumstantial evidence. What cases can you point to where a punitive damage award was taken away by a court for not establishing malice? We cite a couple, Your Honor. I will be honest. We were unable to really locate a case that in this context said there's not enough. They cite two cases which are employee rating cases where the court, this court, said that is enough. It could support it. We largely distinguish those because there they were large-scale ratings where you went after someone in a competitive effort and took their whole department. I agree. Those were better cases for punitive damages, those two. What I'm trying to find out is this is below that, but is it still enough? That's why it would be helpful to see a case where it was taken away. Unfortunately, mostly it's limited to the Texas Supreme Court cases which have taken away when there's simply no evidence. I think this is really just a no evidence case. If you look at the apolis brief on page 28 of their response brief, they list essentially five bullet points which is all of the evidence they contend supports it. If you look at those four bullet points, only two deal with concilium and directly to your point. Of those two, the first one is you hired a guy that you knew how to non-compete, which is clearly not sufficient evidence. The second one is you located your business near ours, which is neither evidence of malice nor connected to us hiring Mr. Gresham. The reason why is we established our business a year and a half before we ever hired Mr. Gresham, so the linkage between the proximity and us hiring couldn't be there. The last two bullet points deal with Billy Bowden, who was our employee, who texted Mr. Gresham back and forth. The first bullet point they say is he was a bitter ex-employee and he was fired and he was unhappy, but there was no testimony at trial that anything he did was either on our behalf or was trying to injure his former employee. In fact, the only testimony that was given was that Mr. Bowden told Mr. Gresham, don't leave that job where he worked. And the last one is he sent a joking text message that told Mr. Gresham, on your way out, give our old boss a slap on the back of the head. Mr. Bowden explained that he was joking and there was certainly no evidence that could be inferred from that of malice on our part. Now the last point with respect to this is the court has to be careful because what Mr. Bowden was doing was unconnected to our hiring of Mr. Gresham. He testified, and it was uncontradicted, that he played no role and had no decision-making authority in that hiring. And therefore, despite the fact he was texting back and forth, and even if he didn't like his former employee, that doesn't constitute legally sufficient evidence. Therefore, we think that this is a seriously flawed verdict. We think the jury essentially tried to move damages around to make sure it didn't hit the employees and that they were not, there was no evidence to support the malice finding. Well, there were no issues with respect to whatever the jury charged the judge gave the jury on that point. I mean, we don't have an issue relative to that. That's correct, Your Honor. We believe he instructed the jury correctly. We just don't think there was evidence sufficient to support that finding. There is a second issue he raised with respect to damages overall. And of course, if the court reverses on just the damages awarded, it would take away the punitive damages portion of it. And that is that the appellee, Merritt Hawkins, had one witness who testified as to their damages, Mark Smith, their company president. There is a disconnect in our briefs, I believe. We're not arguing the company president was incompetent to give testimony about damages generally. The case law on that is clear. What we argue is that there are limits as to what a company president can do as a lay expert witness. And Mr. Smith, in this case, well exceeded the boundaries of what would be permissible. We've detailed in our brief some of the things he did, but he first testified as to damages to $100 per page of documents that Mr. Gresham had deleted without support, foundation, methodology, or any other backup evidence. It appeared to us at trial to be literally pulled out of whole cloth because there was no supporting testimony that this is what would cause to recreate that information or any data to support it. Second, he testified as to lost profits caused by the departure of Mr. Gresham, but not in the classic way you would expect. Just to be clear about this witness that you say is not competent to express the expert opinion, I guess. He was an 8-year president, 26-year employee of MHA, right? That's correct, Your Honor. And the testimony he gave was the profit that the company lost as a result of Gresham's departure. That is correct, Your Honor. And he testified to the cost of training and replacement, the cost to replace the information that he says was stolen, Greg Gresham itself. The standard under 701 is can he provide a broader range of testimony than a traditional lay witness can when testifying to matters concerning his business. The district court allowed that testimony. Why is that an abuse of discretion under that standard? I mean, this man has got 8 years as president of the company, 26-year employee of the company, and I would take it that he is concerned in that situation with the profitability of the company, and we have historically allowed owners, as you acknowledged at the outset, to testify. It is because, I mean, under 701, obviously, the lay witness is not empowered to do anything, particularly when the lay witness is going to testify about lost profits. We agree a business owner generally can get up within reason and speak to lost profits, but you have to ask, what is the basis for that testimony? If, I will give you an absurd example to make my point, if the business owner was to say, I took last night's winning lottery number, multiplied it, and those were my lost profits, we would all agree there is no methodology for that. Didn't you just challenge it under whether he is qualified under 701? Did you bring a challenge to the reliability of the testimony? The methodology? We did. We did both. We did both to the district court. We challenged his qualifications because we felt the things he was testifying about, he wasn't qualified. Yes, he was company president, but he had never duplicated documents or information, so he had no basis for that. He had the training program, for example, was ongoing. You weren't subbing people in or out, and he had no basis by which to make that determination, and we questioned the methodology. I mean, his lost profits analysis and why we would challenge it is it wasn't we lost this employee and lost this business. He didn't do that. He simply said he just measured it against a new employee who came in, not Mr. Gresham's replacement, and said that person only did X business, and we thought maybe Mr. Gresham would have done Y business. I'm going to take that difference. Without ever looking to see what happened to Mr. Gresham's old clients as an offset or— He testified as a lay witness, right? He did, Your Honor. All right. Let's back up a step. I mean, I take it when you get ready to try this, we're dealing with a pretrial order, right? Yes, Your Honor. All right. So I'm assuming that, well, I guess nobody sought to tender somebody else as an expert, or there either wasn't one or their shot was going to be—was it an attempt to qualify him as an expert? Well, yeah. I mean, we had challenged him under Daubert. The court had overruled that challenge. We made our record. Right. But I'm just backing up a step of whether it was an attempt first by them to put—qualify him as an expert. That doesn't work. So now his actual testimony is not in any kind of expert capacity, but as a lay witness, really, right? I mean, as to the capacity he testified in was as a lay witness, albeit the owner of the business, not as an expert as we know the word, right? Well, yes, Your Honor. But I think he was offering essentially lay opinions as a lay witness for things which were normally or supposed to be within his realm of knowledge. Right. And you challenged him across the board, number one, that, yeah, he was there, da-da-da-da, but you challenged that this was outside the sphere of his knowledge, et cetera, et cetera. Correct. Because the way I got it, he was kind of tendered as what I call a hybrid witness. He wasn't tendered as an expert, but they put him on as a well-informed lay witness, shall we say, to testify about these profits. And I guess the point I'm getting to—I was trying to get back to kind of how this was handled, you know, in the pretrial order, da-da-da-da-da-da, and then my question was, well, presumably you deposed him beforehand, no? We did. We did. And that was the basis of our challenge. All right. So he was deposed and so forth, so you know what he's going to say, da-da-da-da-da. So, A, the question is, I assume the court gave you sort of unbridled cross-examination in light of your having lost the challenge on him, but the court didn't cut you off at the pass by saying, you know, go for it. And so you do what good lawyers do, make the guy look bad on the stand, unworthy of belief, et cetera. But in turn, I take it in your case there was no counterbalance by somebody showing affirmatively, here's why what this guy said can't be believed, da-da-da-da. So am I— That is correct. I mean, I don't have a complaint that the trial judge prevented us from asking this witness something that we thought we should be able to ask, and we did not call an expert witness to come in and say, here's our own methodology for how it would be because— So you rip him to shreds. My words, not yours. Thank you, Your Honor. But I just, you know, kind of visualizing just a feast on cross-examination, you know, where you just go after him up, down, sideways, and a whole nine yards, to which you hope the jury will see, like, this guy can't testify to this. But despite the scintillating, brilliant textbook cross-examination, the guy has charm, charisma, whatever. So the jury says, da-da. So in a fully tried jury case with all that I just said, how does it become reversible error? Do you understand where I'm headed? I do, Your Honor, and I think it goes to the classic first step for any lost profits or damaged analysis, that there must be some methodology. This was not a testimony about out-of-pocket. You just said this evidence is inherently defective, notwithstanding whatever I just said. Correct, Your Honor. Yours is just essentially fine as a matter of law, that no matter how much discretion of jury, da-da-da-da, but this evidence is here, is just so defective, it's reversible. I mean, I'm not trying to put words in here. I'm just trying to cut to— There must be a gatekeep for function at the door that doesn't let in bad methodology. So, for example, I think for every document, every piece of paper that Mr. Gresham deleted, $100 is fair. Seems simple and easy. Sounds great. However, could that come in? Is there a methodological reason that would support that at the first instance? It's not fact-based testimony. And since I saw him delete it, it is I'm coming up with my own analysis as to what our damages were. Same thing with training costs. They don't have a training program where you sub one person in and one person out if he leaves. He just simply took a round number of their ongoing training program. This is a company that has 25% turnover a year, so people are coming and going. He didn't identify a specific out-of-pocket loss. He did some math on the back of an envelope to get numbers to say here it is. And our argument is, Your Honor, to your point, is that the methodology for that lacks any evidence or foundation and should not come in and should not serve as a basis in future cases for people to say, as long as the guy's my president and has been there for a bunch of time, he can say almost anything. And that's really the two issues in this case. Number one is when you hire someone, even with a non-compete. But on the lost profits, I mean, you're not doubting the accuracy of what he said. He says, This guy left the company. They stole him away, and he was bringing in this much business. And I'm going to compare him to this other new employee who wasn't bringing in much business, and here's the difference. That's all within his knowledge as the CEO or the president. You can attack it as true or not, but I don't hear you saying it's not true. So the jury heard it. I mean, you say it's a methodology. I mean, you don't need some financial consultant to come in and do that number crunching to compare two employees. It almost sounds like you're just saying legally that's not a sufficient basis for awarding lost profits. May I respond? Oh, yeah. Your Honor, I guess here is what I have. You have to—I don't dispute the numbers. However— Or that he had firsthand knowledge. He had firsthand knowledge. What we do dispute and where it goes to the real root of the issue is the comparison. He had to pick two things to compare and what to exclude and what not to include. Aren't you then really insisting that he meet the standards of an expert witness? In effect, if he's going to step outside the typical president, which is our sales last year were $1 million. This year they're $800,000, and we know this other competitor has $200,000 in business. There is a line between—or it may be between the proffer of expert testimony and lay testimony, as the Chief was pointing out earlier. And your understandable objections to the want of a more scientific, a more determinable objectively measure or metric here sound very much as if you were testing the—you're insisting upon the measures of expert opinion. Expert opinion, it doesn't come from actual firsthand knowledge of the particular fact situation, but using expertise elsewhere to apply to the existing fact. This comes from people who are hands-on, day-to-day work, and so the rules are different. Your Honor, the only thing I would—I agree the rules are different. I think the issue is that this is not about whether or not Mr. Smith could testify about damages, but the limits of that testimony. When he steps outside of reciting facts in his knowledge and says, I think a good comparison is Mr. Gresham versus this new employee, or I think a good comparison is, oh, I don't know, 25 hours of training, even though Mr. Gresham didn't go through the training program, I believe he stepped outside the protections that 701 would provide. Why doesn't that go to the proverbial weight of the evidence? Why doesn't that go to the—I've just got my trial judge hat on. I'm trying to work my way through it. This is a bad analogy, but to me it's like hearsay evidence. If you get an objection, I'll sustain it as hearsay, but if nobody objects, it's evidence. If a jury considers the hearsay as part of it, hey, there was no objection. There had been when I keep it out. My point being, I hear you. Once I've got you within the lay witness framework of what happens, you skyrim up and down, you don't affirmatively rebut him through somebody saying, nope, you can never do that. He pulled it totally out of the air, da-da-da-da, but jury does what they do. And so you get something that maybe is logical, but where is it inherently so defective? Now, what you're really arguing for is you don't want us to put an opinion out here that embraces this kind of witness so in another case you're up against that, then I would get that if that's the subliminal piece of it. But if it's really a fully tried jury case, the evidence is there, we get the issue. Saying it was an abuse of discretion, I mean, the weight of the evidence, maybe I wouldn't have given it some, but if he comes with this number, I'm still just not quite at how, you know, it's like up in the planets, so unreasonable that, you know, we reverse it for that basis. But that's not, I'm just still working through it. With the court's indulgence, I'll take one last step. When a witness steps into evaluative testimony, so outside numbers, when a witness steps into judgment, it's right to compare, to come up with a damages figure as opposed to here are my profits, here's what I spent on this individual and lost out of pocket. When you get into that realm, the law says it is not just to the weight. There is a function first to is this something that should even go to the jury because of the confusion and the inability sometimes to properly deal with it. Look at the three gods of 701. Is it rationally based on a witness's perception? Is it helpful to understand the witness's testimony? Is it not based on scientific, technical, or other specialized knowledge? So those are the gods that we get under 701. If a witness says, I came up with $100 because, as he testified, it seemed simple and not that much, that can't rationally be based on anything. If a witness says, I don't really know what happened to Mr. Gresham's clients. I mean, I know some other people did them, but I'm not comparing them to this. I don't think that's rationally based. If a witness gives testimony that's not rationally based on a methodology that is supportable, the typical case law would say it's not helpful to the jury. Rationally based upon the witness's perception. Otherwise, Your Honor, you would open it up to almost anything. A company president saying, look, it's my perception we got killed last year in sales. I didn't look at the numbers, but I see a lot of sad faces in our sales department. A lot of gloomy people. My bank called me and told me we were a month behind on the line of credit. I think we lost a couple million dollars. But that's lack of personal knowledge. That's why I go back to it. You're not disputing what he said the productivity was of the guy who left or what the productivity was of this new woman. So he's just saying this guy made this much, she made this much, and that's all within his knowledge. He has that perception. And then the jury hears it and they figure out what they want to do with it. What if he'd said the average person at our company makes this much and the person who left made this much and brought in this much business? I think the problem, Your Honor, is if he could link those. In other words, the loss of an employee doesn't necessarily mean you've lost revenue. And so to pick someone out to give that comparison with no basis behind it. I mean, an associate leaves my firm does not necessarily mean our revenue will go down if everyone else will work harder. The proliferation of restrictive employment covenants would suggest otherwise. An economic reason for trying to restrict the departure of employees. If it doesn't matter, then I think you wouldn't see quite so many of them. No doubt, although in this case, and it's another issue, and I'm sorry, but another issue for Mr. Bowden. Mr. Bowden's contract had a liquidated damages provision. Mr. Gresham's did not. But to the extent you infer from that liquidated damages provision as to what they think their damages are, it's did the person who leaved go off and do other placements. So that's a better test than what Mr. Smith did. Unless the Board has additional questions, I appreciate the explanation. All right, thank you, Mr. Sewell. That's why we like oral argument. We like being able to answer questions. You're helpful to us. Counsel was trying to get out of his seat to get up here. I was eager to come visit with you, Chief. You're up there now. May it please the Court, Chris Cradiville from Dykema-Cox Smith, along with my partner, Mr. Brian Faleo. Your Honors, I think we've just seen a good example of why appellate courts don't generally second-guess juries on fact findings, particularly after a week-long, well-tried case with very capable lawyers on both sides. This Court should reject Mr. Tillotson's frontal assault on a modest and conservative jury verdict that, again, was reached after a five-day trial. I want to be clear that this is not some sort of runaway jury situation, but rather a jury that issued a verdict robustly supported by record evidence and accepted in its entirety, almost in its entirety, by now-retired Chief Judge Solis in the Northern District. Indeed, the only alteration in the verdict that Judge Solis made is the one that is the subject of our cross-appeal. Let me move you to punitive damages. Yes, Your Honor. As I read what you're doing, you are really asking us to impute Bowdoin's malice to Caecilium for the purposes of punitive damages. And as I understand Texas law, that you cannot do. Well, Judge, I don't think I'm asking you to do it. I think we asked the jury to make a conspiracy finding and also a respondeat superior finding. And if you look at Question 20 in our jury charge... You broke that out in your Rule 49 submissions? Your Honor, on the Rule 40, it is in the jury charge. Question 20 is an affirmative answer from the jury on respondeat superior. And yes, Judge Solis did give that to the jury as a freestanding question, that Mr. Bowdoin was acting within the scope and course of his employment when he tortiously interfered with Mr. Gresham's employment contract. But that's true only if you have a finding. Do you have a finding that he authorized it and ratified the malice itself? I've got two findings that I think answer this question, Judge Higginbotham. One is the conspiracy finding that Mr. Bowdoin and Conciliam were in a conspiracy to tortiously interfere, and two, that Mr. Bowdoin was acting in the scope of his employment, respondeat superior, when Conciliam unleashed... The conspiracy doesn't really add much to that equation in and of itself. It's just an agreement between two or more persons to accomplish an end that is forbidden by law. And, of course, that just begs the question of whether a breach of the covenant, a simple breach of an employment covenant necessarily supports punitive damage. Judge Higginbotham, let me try to go back up to 35,000 feet and give a little fuller picture of the evidence that, in my view, supports... ...datum that in regard to punitive damage in Texas, you know, better or for worse, now I think it's very difficult. Your Honor, what I think ultimately... The Texas Supreme Court has found the evidence insufficient for punitive damages in nine out of ten. Only in one case since the tort reform in Texas has any punitive damage been sustained. Your Honor is quite correct that the Texas Supreme Court has not found punitive damages. All I'm suggesting is that you are operating in an environment which seems to be, shall we say, not friendly toward punitive damages. I'm not making a comment about the wisdom of that, but that's the terrain. I am glad to be in New Orleans rather than Australia. Your Honor, I think the key piece of evidence that in Mr. Tillotson's presentation wasn't mentioned as supporting these punitive damages as against Concilium is that Concilium's founder, a man named Joe Hawkins, who is the Hawkins in Merritt Hawkins & Associates, was well aware of these covenants. He wrote them. He came up with them in the first instance for MHA. Everyone at Concilium from Mr. Hawkins on down was aware of Mr. Bowden's covenant, was aware of Mr. Gresham's covenant, and yet still they pressed on. This isn't the same. Is there any evidence that this was a pattern that there were other employees Concilium took from your client? Your Honor, when the Court denied the Rule 50 motion on this, it was aware of other State court litigation that the jury was not aware of. That's something Judge Solis was well aware of. These two companies — The jury didn't hear anything. No, the jury did not know about that, but they did know, Judge Costa, about Concilium being essentially a copycat business right down the street founded by the same man who had founded my client, Merritt Hawkins & Associates. There were different markets. No, Your Honor, that was Mr. Tillotson's argument, to be sure, but that's something that Judge Solis rejected. They're both physician placement firms. Now, they want to subdivide the market into permanent staffing and temporary staffing, but right on their website, Judge Higginbotham, right on their website, it boldly says they do permanent staffing as well as temporary staffing. Merritt Hawkins specializes in permanent staffing, but this is really a distinction the trial court rejected, and it's based on the plain language of their website. Is there any evidence that Gresham, when he stole the computer files or took the computer files, that what he did with them, that MHA used them, that MHA, I'm sorry, MHA, Concilium, knew about him taking the files or used them in any way? Your Honor, there is no evidence of use, and I think most of the damages from Mr. Gresham's Sunday evening raid, he raids the computer system on Sunday evening and resigns by e-mail the next morning at 7 a.m. without coming back into the office. So the last time he's in the office is to conduct this raid on MHA's computer system. He deleted 800-something files, copied 400-something files, 270 approximately of those files were unrecoverable. But the portion of the damages here that's, I think, there's a finding of $50,000 in damages on Mr. Gresham's harmful access by computer. Our expert, our forensic expert, Mr. Kelly Jones, who came in to investigate this breach of security and to find out what had happened, what had been taken, what had been deleted, independent of his litigation costs, billed MHA $60,000. So Mr. Jones's bill alone, his $60,000 bill, exceeds the jury's award of $50,000. So I think we're on very solid ground with regard to that $50,000 award for harmful access by computer against Mr. Gresham. There's also evidence in the record that the in-house IT consultant had to spend eight-and-a-half hours at his hourly rate on this on top of Mr. Jones's $60,000 bill. So the $50,000 the jury awarded on harmful access by computer really should not trouble this court in any way. Let me bring you to another point that kind of jumped out at me for whatever it's worth. That was the exclusion of evidence about the Arthur Miller, these transfers, that sounded like your client is hardly a non—he's hardly a— you seem like he's playing the same game of hiring other contractors, bringing people in and then in breach of their employment covenants. And Judge Solis did exclude that within his discretion under FRE 403. And they excluded that, but then you are arguing to the jury that this is the wrong way to do business and you just don't do this well. And your client, and you shielded from a response because the district court excluded evidence. He does the same thing. You guys are just stealing each other's employees. When you start talking about punitive damages, that to me, you're putting a black hat on them, but you tied the other guy's hand behind his back. Your Honor, there was a settlement. So just to provide some context. Well, help me with that. Mr. Gresham left to go to a firm called Arthur Marshall. He was there a very short period of time, and he rejoined MHA. There was a dispute between this third party, Arthur Marshall and MHA, regarding Mr. Gresham's return. There was a settlement reached between the parties, so there was consideration paid in that settlement or given in that settlement to get Mr. Gresham back on board at MHA. Here, of course, there never was any such settlement. There was a week-long jury trial with the jury finding. This would be a very different analysis if they had given consideration based on their improper recruitment of Mr. Gresham. And also, I think the situation is very different, Your Honor, given, again, this awareness that everyone from Mr. Hawkins on down to Mr. Bowden at Concilium had of these covenants, that they were the architects of these covenants and yet chose to ignore them. And I think the danger of jury confusion, I don't think there was an abuse of discretion, Your Honor, there, that there would have been some sort of mini-trial trying to compare this Arthur Marshall situation and settlement to the situation in this case. I don't think that would have been helpful to the jury. I think it would have confused the jury. I think it would have been prejudicial, and Judge Solis agreed, and I think he was well within his discretion to do so. That would be the normal reaction, not to go off on that rabbit trail. But what bothered me about it was that you argued to the jury about these bad practices and bad actors and so forth, and the fact of the matter is they were, in fact, hiring people themselves, and they were litigating right away themselves. We were getting our hands slapped for it and having to settle the matter. But, Your Honor, let me go back to Mr. Smith's testimony that was the subject of so much discussion with Mr. Tillotson, because I think there's a very simple way out of this box, a straight line out of this maze, and that's the testimony from Mr. Smith, the president of the company that Judge Costa alluded to, that there was $30,000 in change in lost profits here calculated very simply on this new employee, Ms. Wilmoth, who was the indirect replacement for Mr. Gresham over the 12-month period, and his non-compete runs for 12 months. That's the amount of profit the company lost. That's about as straightforward as it gets, and I think a 26-year company employee who had worked in every aspect of the business, rising through the ranks to become president, eight years as president, can testify to that. I know opposing counsel doesn't like this $100 per file, not per document, per file, and some of these files were many hundreds of pages, but the jury could get to this $30,000 number on lost profits without ever using that number. In fact, I think it's a testament to the quality of Mr. Tillotson's cross-examination that the jury limited its award of lost profits to the $30,000 attributable to the Wilmoth-Gresham comparison and did not give the $45,000 in training costs and did not give the $27,000 for deleted documents or $42,000 for information removed. So, again, I think President Smith was on very solid ground on that $30,000. Returning to the malice finding, I think what the jury heard was that Concilium effectively unleashed a disgruntled former MHA employee as a recruiter on MHA. And Mr. Tillotson pointed to some evidence that there was not recruitment, this sort of self-serving testimony from Bowden that he really wasn't trying to recruit Gresham. The jury simply didn't credit that. There were 85 text messages, multiple phone calls, multiple in-person meetings, and Mr. Bowden working hand-in-glove with the in-house corporate recruiter at Concilium, a woman named Christina Sullivan, I believe, that he was reporting to. This was a recruitment that Concilium authorized, and their designated recruiter was an admittedly disgruntled former employee. And Mr. Tillotson tries to write off the comment about slapping Tim Beidle, the supervisor, on the head on the way out as a joke. The jury didn't take it that way. In reading the cold record, the same record this panel has access to, I didn't either. At trial, Mr. Kaleo asked him about it, and he volunteered that he stood by the comment. Mr. Kaleo was walking him through his text messages, his 85 text messages recruiting Mr. Gresham, and he could see where Mr. Kaleo was going, that he was soon going to ask him about the infamous slap to the back of the head. And before Mr. Kaleo could get there, he said, and I forget the exact wording, but he essentially said, I stand by the slap on the head. So this jury was, in making its credibility determinations, in weighing, they did not have to take that as a joke. So, again, what you have is a copycat company down the street founded by the same man who founded MHA and sold out, founded by the same man who came up with MHA's restrictive covenants and was profoundly well aware of them because he had enforced them while at MHA, unleashing an angry employee to recruit one of our employees. That, Your Honors, is how we get an award of punitive damages here. And I think that the jury saw that clearly. Okay. In terms of, there's some complaint in the opposing party's brief that the jury verdict was inconsistent, that there's an award of $30,000 against concilium for tortious interference, but not an award for Mr. Bowden, who was found to have committed tortious interference, but he was not found to be liable for any damages for that. I think there was no complaint from the other side about the charge, no objection to the charge, no effort on their part to try to link the damages questions for concilium and Bowden on tortious interference. And the jury assigned blame as it saw fit. It assigned blame to the quarterback rather than to the blocker, if you will, that they saw concilium as the architect of this recruitment scheme and put the blame and put the damages on them rather than on Mr. Bowden, even though Mr. Bowden was their co-conspirator and he was acting in the course and scope of his employment. We also have a cross appeal on the very small award of damages, $2,000, against Mr. Bowden for breach of his non-solicitation clause. And this is really a fairly straightforward question of contractual interpretation. In Mr. Bowden's agreement, there is a liquidated damages provision that casts damages for violation of his contract in terms of successful physician recruitment. In other words, taking business from MHA to his new company. Of course, that's not what Mr. Bowden did. He didn't breach his non-compete. He breached his non-solicit and he stole away his friend and former co-worker, Mr. Gresham. And because he was not stealing business, it's our position that as a matter of law, that liquidated damages clause simply does not apply because it's not a reasonable attempt to anticipate the damages that would flow from a breach. Let me provide a simple example that I think will make it clear to Your Honors. Let's say that Mr. Bowden had recruited the IT guy, the IT guy who testified in this case, or a receptionist, or one of the assistants, one of the secretaries, someone who's not a revenue-generating employee. Now, he's equally restrained from recruiting them just as he's restrained from recruiting Mr. Gresham, and those employees obviously don't recruit physicians. So if the interpretation of the liquidated damages clause that Judge Solis reached is correct, then Mr. Bowden or anyone who's signed the same clause, it's open season on non-revenue-generating employees at MHA, and that's simply not a reasonable outcome. And so I think that's the one area where Judge Solis got it wrong and the jury got it right. The jury awarded this modest $2,000, really almost a symbolic award against Mr. Bowden. Judge Solis took that away on a Rule 50 motion based on the liquidated damages clause. We would argue that under Texas law, that liquidated damages clause simply does not hold water. There's extensive briefing on the questions of attorney's fees, which I know is rarely of interest to the court. On fees, I do have some interest. Are you saying Judge Solis didn't recognize that he could give fees for work that was inextricably intertwined, or did he just not find that there was a sufficient basis for making that kind of finding? Your Honor, there's a problematic statement in his order where he talks about work that's exclusively attributable to the harmful access by computer claim. And so I saw that, but doesn't he also elsewhere recognize that inextricably intertwined work is — can be awarded fees? He does recognize that, but then he doesn't award the fees. So there is some internal tension in Judge Solis's order limiting the fees to what's directly attributable to our successful harmful access by computer claim. And I would say that — so, for example, we didn't prevail on the Federal equivalent. Harmful access by computer is a state law cause of action. Very similar — Did you give him a number that you thought was inextricably intertwined? We did. I believe that's in Mr. Kaleo's declaration, and that essentially all of this arises from one nucleus of operative fact. It's Mr. Gresham's departure from the company under recruitment by Mr. Bowden in his Sunday evening raid on the computers. There's arguably two different — there's him leaving the company, and then there's the whole computer business, what you call the Sunday night raid. I mean, I could see a basis for saying those are sort of two separate — The other thing that I think Judge Solis got wrong in this, Judge Costi, is, as you can see from my remarks, the enforceability of these covenants not to compete is a massive issue to both these companies. I don't think we'd be down here fighting about a $200,000 judgment if it wasn't. Those covenants were found to be enforceable by Judge Solis. He entered summary judgment that Mr. Gresham had breached his covenant not to compete, and then he allowed the jury to hold that Mr. Bowden had breached his covenant not to solicit. So by prevailing on those contractual claims, even though we didn't receive substantial monetary damages, that's a remarkably important victory for MHA that I think makes us the prevailing party under 38.0018 of the Texas Civil Practice and Remedies Code, as well as under the fee-shifting provision of the Bowden and Gresham employment agreements that would give fees to the prevailing party. That's us. Judge Solis erred by not doing so. I see my time is up. Thank you. All right. Thank you. Back to you, Mr. Tillotson. Yes, Your Honor. If it may please the Court, I'd like to start with fees since it's the last thing that was mentioned. First, the only claim by which Merritt Hawkins was entitled to fees was harmful access of computer claim. They got zeroed out on everything else. So the problem was they submitted their fees for everything and said the old-fashioned, gosh, it's all intertwined. The judge didn't get the standard wrong because he told them this is the standard, now go segregate. And everyone knew because we had segregated and included some intertwined fees along with segregable fees on our fee request. They came back with $27,000 off a $430,000 fee. The Court said you've made it impossible for me really to do it. You've heavily redacted. As a result, and then they try and make this the standard, the judge says, as a result, I'm going to start with the obvious, the stuff I know is just related to harmful access, and I'm going to go from there. They've tried to somehow morph that into the standard, and it's not right. The fee award and what they did, there's absolutely no abuse of discretion in what Judge Solis did there. And as the Court knows, he then basically zeroed out the fees and said you won this claim, they won that claim, I'm going to zero it out. I want to just, in the modest defense of $2,000 for Mr. Bowden, because it is important to an individual who went through his first lawsuit, the reality is, for Mr. Bowden is, is that although he sent a single text message among many that he said was joking, the jury did not seem to aim its anger at him, as they suggest. They found zero damages on tortious interference. And you would think he was the ringleader. They would have felt different. $2,000 on the non-solicitation. The problem was that agreement was covered by a liquidated damages provision. For the first time in the lawsuit, after the judgment is rendered, after we go to the jury, they say, wait a minute, that provision isn't enforceable. Never raised in their pleadings, never raised in the summary judgment pleadings, never even raised in the pretrial order. The only people who raised it was us, who kept saying, he is bound by this liquidated damages provision, only allow damages evidence that relates to this provision. That was overruled. However, Judge Solis then fixed that on our motion for judgment as a matter of law on Mr. Bowden. There is no basis to disturb it, and there is no basis to let this company, who spent thousands of dollars trying to enforce their contractual rights, after they get something they don't like, to say this one particular provision is invalid. These were not contracts that were negotiated. They were presented to employees and told, sign them, and they have to live with it. Finally, with respect to Malice, the case they talk about in their brief, that this was Mr. Hawkins trying to steal back his business and create this business, was not trite. There was no evidence with respect to that. Mr. Hawkins didn't even testify. Judge Solis excluded evidence of the sale of his business. Judge Solis, there was no evidence regarding any other employee hired. In fact, that's the only employee ever hired from Merritt Hawkins at the time that the lawsuit happened. And more importantly, there was no evidence that somehow Concilium thought it could injure these guys by hiring this one employee or any purpose for doing it. And I would draw a distinction, as I think the case law does, between disliking someone or not being happy and then doing an act that's designed to injure them. I have a bad experience with a particular business. I didn't have a good job there. Someone says, I'm thinking about interviewing there, and you say I wouldn't go there. You may not be specifically trying to injure them. You need something more than that. They keep saying, and I told you this is what they're going to argue, which is Joe Hawkins knew about these non-competes. They all did. However, that is an element of torturous interference, and that alone simply cannot suffice. This punitive damages finding we see as having no evidence. And finally, with respect to the lost profits and the issues, for us I understand a corporate president testifying, but for us it was the evaluative part that we found so problematic. I appreciate the court's time. Thank you very much. All right.